UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| SHARON SWEENEY,<br>         Plaintiff<br><br>V.<br><br>POST UNIVERSITY, INC.,<br>BOBBY REESE, JOHN HOPKINS<br>         Defendant | :<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:         NOVEMBER 2, 2017 |

## COMPLAINT

### INTRODUCTION

1.  This is an action to redress rights to free speech under § 31-51(q) of the Connecticut General Statutes, and common law claims for tortious interference and intentional and negligent emotional distress claims. The claim under § 31-51(q) involves an exercise of free expression guaranteed by the First Amendment to the United States Constitution and Sections 3, 4 and 14 of the First Article of the Constitution of the State of Connecticut.

### JURISDICTION

2.  Jurisdiction is based on the existence of a federal question pursuant to 28 U.S.C. § 1331. Supplemental jurisdiction over Plaintiff's state law claims is based on 28 U.S.C. § 1364.

### PARTIES

3.  Plaintiff, Sharon Sweeney is an individual who resides at 19712 South Regan Road, New Lenox, IL 60451.

4.  The Defendant, Post University, Inc. ("Defendant" or "Post"), is a Delaware corporation with its principal place of business located at 800 Country Club Road, Waterbury, Connecticut 06723.

1

5. The Defendant, John Hopkins, is an individual who resides at 125 Periwinkle Drive, Unit #125, Middlebury, CT 06762.

6. The Defendant, Bobby Reese, is an individual who resides at 925 Oronoke Road, Apt. 23d, Waterbury, CT 06708.

**FACTS**

7. Plaintiff began working for Defendant as a consultant in or around January 19, 2016 for a six month term.

8. Plaintiff initially interviewed with Defendant's officers in the summer of 2015. The parties were unable to reach an agreement on compensation terms and Plaintiff declined the offer.

9. Two to three months later, in or around October of 2015, the then CEO of Post, Tom Samph, contacted Plaintiff and along with Donald Kelly, the VP of Human Resources at the time with a modified offer. Plaintiff accepted the offer as a consultant for a six-month term.

10. As of the time Plaintiff began working at Post, she had over 30 years of experience in compliance matters and education financing for students in higher learning institutions. At Post, Plaintiff's role was to work with the staff of the Student Finance Department to improve processes and procedures.

11. Approximately two weeks after Plaintiff's start date, in or around January of 2016, Defendant hired a new CEO, John Hopkins ("Hopkins"). In March of 2016, Hopkins hired a Chief Enrollment Services Officer, Bobby Reese ("Reese"). Sometime later, Reese was promoted to Chief Operating Officer.

12. Due to the nature of Plaintiff's position, she regularly interacted with Reese.

13. In or around April 2016, Troy Harris ("Harris") from Enrollment Management Consultants was also hired as a consultant to focus on online enrollment.

14. Once Hopkins was hired, Plaintiff reported directly to him. After working with Plaintiff for about two months, in or around March 2016, Hopkins offered Plaintiff full-time employment, which she accepted.

15. Plaintiff became a full-time employee of Defendant on April 4, 2016.

16. Plaintiff's performance was favorably received during 2016. Hopkins complimented her efforts many times during 2016.

17. In April 2017, Plaintiff was promoted to Chief Regulatory Officer after handling an audit resulting from irregularities discovered by compliance auditors (ALMICH) with respect to enrollment reporting. Due to the large number of irregularities found, the federal Department of Education required a thorough review of all reporting for 2015. Plaintiff led that effort for Defendant.

18. In the summer of 2016, the focus of discussions with Reese increasingly centered on expanding student enrollment. He regularly said things like "it is all about the numbers" and "we have to get them in the door."

19. Reese shared with Plaintiff that the "plan" was to make Defendant as profitable as possible and sell it in about three years. Reese had an interest in promoting a sale because he stood to financially gain from it. Hopkins also stood to financially gain from the sale.

20. There were a few instances in 2016 and early part of 2017 wherein Plaintiff had to intervene because Reese was directing actions, for the purpose of increasing enrollment, that were unethical and improper.

21. On one occasion, Plaintiff learned that an admissions representative told a student to state on the student's financial aid application that the student's income was zero, even though the student had earned income. The admissions representative was essentially advising the student to make a misrepresentation on an application for federal financial aid, which application was submitted to the federal government. A student that is not earning any income typically qualifies for some federal grant aid, even though the amount of the aid could vary. The admissions representative was aware that the student had earnings. Plaintiff expressed her concerns about this situation to Reese, since he had oversight over the admissions representatives. This was one of many occasions where Reese made excuses for the admissions representatives' action. In reality, it was the pressure Reese was applying to the admissions representatives that was resulting in them engaging in unethical actions for the sole purpose of increasing enrollment.

22. On another occasion, Plaintiff noticed the Federal Department of Education logo being used on Post documents that had been created by the admissions department. Again, Plaintiff was forced to intervene. She advised Reese that the use of the logo was improper since Defendant had not obtained permission from the U.S. Department of Education to use such logo.

23. Plaintiff also had to advocate against Defendant's practices with respect to enrolling students in their online program. Typically, online students were from an economically and socially disadvantaged group. Plaintiff learned that the admissions personnel were permitting students to enroll in the online program without producing a high school transcript. In order to increase enrollment, the most basic requirement for admission was being ignored. This practice was inconsistent with the Plaintiff's prior experience.

24. The lack of the high school transcript disqualified the student from obtaining federal financial aid, but the students were not informed of this. After one or two modules, the students would be removed by the Registrar from all future classes, but the students left Defendant owing tuition which they could not pay without federal aid. Plaintiff became aware of many instances where the students were surprised to learn that they needed a high school transcript to obtain federal aid and that they were leaving with debt. This information typically came to light when they were removed from the Defendant's program with debt.

25. Plaintiff expressed opposition to this policy as it misled the students. This was particularly troubling to Plaintiff because of the lack of financial resources of these students.

26. As 2017 progressed, the focus on increasing the enrollment numbers heightened even further.

27. Reese became increasingly frustrated by the stagnant enrollment numbers. The frustration led to even more extreme unethical actions designed to increase enrollment numbers.

28. For the modules starting in April and June of 2017, the admissions goals were not met.

29. In a conversation with Plaintiff in or around June, 2017 Reese assigned blame for the stagnant enrollment numbers to the financial aid office, which Plaintiff managed.

30. Specifically, Reese stated that if financial aid would have approved all prospective students as having the "Ability to Pay" ("ATP"), for federal aid purposes, admissions would have made their enrollment goals. Reese further stated that going forward all students would be "yeses" for approval. The ATP preapproval prerequisites for federal aid were based on federal regulations applicable to financial aid. Under the federal regulations, students who had unverifiable social security numbers, citizenship / immigration issues, were in default

on another federal loan, or had an unusual enrollment history could not receive financial aid. Some of the requirements are set forth in 34 CFR § 668.32. There were other standards that also had to be met in accordance with the federal regulations.

31.     Reese wanted Plaintiff's department to assign a positive ATP designation on financial aid applications for each and every applicant / student, irrespective of whether or not the prerequisites to the financial aid eligibility established by the federal government were met.

32.     Plaintiff learned that Reese was attempting to pressure Plaintiff's staff to give students the ATP designation even though the prerequisites to eligibility had not been met.

33.     When Plaintiff learned of Reese's actions, she informed him that Post could not have a policy of assigning ATP designations in violation of the requirements of the federal government's rules on financial aid eligibility.  Plaintiff made it clear to him that the ATP prerequisites were based on federal regulations which could not be ignored.

34.     Reese did not favorably receive Plaintiff's expressions of opposition on the practice he was requesting that all students be designated as having an ATP, irrespective of whether or not the federal regulations were met.

35.     A few days later, in a discussion with Hopkins, Plaintiff reviewed with him an email that showed a breakdown of all students who completed a financial aid application, but could not be approved by her department as having an ATP because of the requirements established by the federal government. There were over a hundred students who were disqualified from eligibility for federal funds. Hopkins became quiet during this part of the conversation.

36.     At the conclusion of the meeting, Hopkins made a comment that Reese and Plaintiff needed to work better together. Because this was the first time Hopkins had indicated

that there was any issue in this regard, Plaintiff inquired as to what he meant. Plaintiff was not aware of any such issue and thought that she and Reese worked well together. Hopkins did not elaborate further.

37. Hopkins suggested that he would arrange for a dinner so that he, Reese and Plaintiff could discuss the situation further. The dinner was scheduled for July 26 at 6:00 p.m.

38. After the meeting with Hopkins, Plaintiff inquired of Reese on several occasions as to whether he felt that Plaintiff and he were not working well together. Reese responded each time by stating that "he didn't know."

39. Plaintiff was surprised that when she arrived, the HR representative, Vicki Whisenhant ("Whisenhant"), was also there and that it appeared that the group had been there for quite some time before her arrival. It was clear that there was some agenda that had been set prior to her arrival.

40. After some initial general conversation, the discussion turned to Reese's issues. Hopkins stated that Reese felt that Plaintiff did not respect his views. Hopkins indicated that Reese had concerns that the admissions department and the financial aid department were not always in agreement on student federal aid eligibility. Hopkins also stated that he wanted the financial aid advisors to sit with the admissions representatives so that they could work out their differences.

41. Plaintiff explained that this issue had been raised once previously and the financial aid advisors were uncomfortable with the suggestion because they felt they would be pressured to make financial aid decisions which were inconsistent with federal regulations of the Department of Education.

42. Plaintiff again explained that there were two financial aid advisors to a group of ten to fifteen admissions representatives. The financial aid advisors had previously indicated that they were concerned that they would feel pressure to make financial aid decisions they were not comfortable with because of pressure from the larger admissions group. Plaintiff expressed her concern about subjecting financial aid advisors to unnecessary pressure and creating a situation whereby the financial aid officers, due to influence from admissions, would feel pressure to relax the standard set by the Department of Education for financial aid.

43. Plaintiff was concerned that by putting the financial aid advisors in or next to the admissions area, Reese would be able to exert his control over them, and it was clear by this time that he was desperate to increase the enrollment numbers and ethics and legal compliance was not the priority.

44. Plaintiff asked Reese at this meeting why he felt that she did not respect him. He indicated that Plaintiff had not alerted him to certain staff transfers from the enrollment team to the retention team. Plaintiff agreed that she would inform him going forward. Reese did not provide any other explanation.

45. After this discussion, Whisenhant, stated that there had been complaints from staff that Plaintiff was a "bully." This is the first time Plaintiff had been told anything like this. Whisenhant stated that her assistant was hearing "rumblings" about Plaintiff from staff. Hopkins stated that the employees probably had issues with Plaintiff's "straight talk" and direct style. This was rather odd given that Hopkins had previously referenced Plaintiff's "straight talk" as something that was positive.

46. Plaintiff inquired of Whisenhant whether there had been an investigation by HR and, if so, what the findings indicated. In response, Whisenhant stated that there were just

"rumblings" and there was no substance to the accusations. Plaintiff stated that if someone had made false allegations about her, it was not clear why HR had not addressed them. Plaintiff indicated that such action may stop the rumblings.

47. Plaintiff also inquired as to whether she knew the identity of the staff who were making the "rumblings." In response, Plaintiff was advised that Whisenhant did not want to identify them because of concerns about retaliation from Plaintiff.

48. As part of this discussion, Reese stated that he "heard" that Plaintiff had been "condescending" to staff at a staff meeting the prior day regarding military admissions to Post. Plaintiff thought this was highly unusual since the meeting was productive and had a positive tone and there was nothing that happened at the meeting that could be characterized as condescending. Plaintiff suggested that Reese and Whisenhant speak with Plaintiff's staff members who were present at the meeting. There was no response from anyone present that this would occur.

49. Reese also said, "You said something a couple of months ago that I really had a problem with." When Plaintiff sought clarification, he said "You made a comment that if you worked at Disney they would fire you." He further stated that Plaintiff should address that comment to the group. Plaintiff reminded Reese that this comment was made in the context of them discussing passengers' behavior on airplanes and how the flight attendants had to deal with that. Plaintiff stated in the context of that discussion that she had noticed the same thing at Disney World. People would be obnoxious, but the workers would have to continue to smile through it, and that Plaintiff would not be able to do that. Plaintiff inquired as to the relevance of that discussion to her job or the topic under discussion. Again, there was no response.

9

50. In short order, it became clear that this meeting was designed to attack Plaintiff. The comments became increasingly offensive. Plaintiff began to feel as though this was an ambush with criticisms that were completely inconsistent with the positive feedback she had previously received. After an hour long bash session, Plaintiff excused herself and left the dinner meeting.

51. The next day, Plaintiff emailed Matt Vining, one of her staff members who attended the meeting with military admissions to inquire as to whether he perceived anything condescending during the meeting. He responded via email that the meeting was informative and professional and felt that military admissions got all of their questions answered. Plaintiff asked Mr. Vining to send this recap of the meeting to Hopkins and Reese.

52. Also on the next day, Plaintiff attended a leadership team meeting that lasted until mid-afternoon. After that, Hopkins met with Plaintiff. During that meeting, he stated "You retaliated 'again' by sending that email to Bobby and myself." Hopkins was referencing the email communication with Mr. Vining, as she had copied Reese and Hopkins on that email. Plaintiff was stumped by the word "retaliation" and "again" since she had never retaliated against anyone at Post.

53. Hopkins then asked, "Are you in or out?" Plaintiff was unclear as to what he meant and responded that she had a lot to think about in light of the dinner meeting. He said, "Well let me know in the next day, week or month what you decide." Plaintiff went back to her office and approximately thirty minutes later Whisenhant telephoned Plaintiff and said she needed to see Plaintiff right away. Plaintiff responded she was in a meeting and would be there in 30 minutes. Plaintiff then went to Whisenhant's office and Ray Lagasse, her assistant was also present. When Plaintiff arrived at Whisenhant's office, she stated to Plaintiff that the CEO

was accepting her "resignation." Plaintiff stated that she had not resigned. Whisenhant said the CEO said Plaintiff resigned. Plaintiff stated that she had done no such thing.

54. Whisenhant called Hopkins into her office. He stated to Plaintiff, "You stated you were out". Plaintiff responded, "No John, that's not what I said. I said I had a lot to think about." Whisenhant then reviewed termination procedure. Mr. Lagasse then took Plaintiff's laptop. He asked Plaintiff what time she wanted to go to her office to collect her personal belongings. Arrangements were made for Plaintiff to clean out her office at 8:00 p.m.

55. Just prior to Plaintiff's termination, she had learned of yet another unethical practice with respect to federal financial aid. Plaintiff had a meeting scheduled for the next day to address the situation. In this instance, a student who needed to finish a final class for an associate degree no longer qualified for federal aid toward the associate degree program. The student had no intention of enrolling in the bachelors program offered by Defendant. For the sole purpose of qualifying for additional financial aid, the academic advisor advised the student to enroll in the bachelors program and later withdraw from the bachelors program once the financial aid toward that program was received. The advisor was attempting to help the student obtain additional federal financial aid, once again, with false information to the federal government. Due to the termination, Plaintiff did not have opportunity to meet with the academic advisor about this fraudulent practice.

56. Approximately a month prior to the termination, Plaintiff had also expressed opposition to another practice of Post which led to false and incomplete information being provided to the Department of Education. The Department of Education requires mandatory Integrated Post-Secondary Education Data System ("IPEDS") reporting. This reporting

11

requirement was enforced by the federal government. The failure to report in accordance with IPEDS could result in fines, as mandated by the applicable federal regulations.

57. IPEDS required Defendant to provide information to the federal government on matters such as enrollment, graduation rates and financial aid. Plaintiff learned that Defendant was not providing accurate information in various areas. Prior to the summer of 2017, Defendant allowed students to enroll without completing an admissions application, which required the student to provide information that is required for IPEDS reporting. The students were permitted to enroll by simply completing an "Intent to Enroll" form which contained no demographic information or other typical background information, some of which was required for accurate IPEDS reporting. When Plaintiff learned of this practice, she advised Reese that the mandatory reporting was not being done properly, that students could not be admitted with simply an Intent to Enroll form and that they had to fill out a full admissions application. Under Reese's direction, Defendant was regularly looking for short cuts that would increase enrollment numbers.

58. Plaintiff had rented an apartment in Connecticut in order to take the job with Defendant. Due to the abrupt termination of employment, Plaintiff had to take steps to quickly terminate her lease for her apartment in Connecticut and arrange for a move back to Illinois. Defendant terminated Plaintiff's employment because she expressed opposition to Defendant's unethical practices designed to increase enrollment numbers.

**COUNT ONE:   RETALIATION – C.G.S. § 31-51(q) – Defendant Post**

1-58. Paragraphs 1-58 from above are incorporated herein as Paragraphs 1-58 of Count One as if fully set forth herein.

59. Plaintiff expressed opposition to the unethical and illegal practices that violated

the federal aid requirements established by the U.S. Department of Education. Plaintiff expressed opposition to practices which encouraged students to make dishonest statements on aid applications to the federal government. Plaintiff expressed opposition to practices which resulted in false and inaccurate IPEDS reporting which are a violation of regulations set by the federal government.

60. Plaintiff's speech was an exercise of free expression, and was guaranteed by the First Amendment to the United States Constitution and Sections 3, 4 and 14 of the First Article of the Constitution of the State of Connecticut.

61. Defendant retaliated against Plaintiff for her speech based on a matter of public concern. Defendant subjected Plaintiff to retaliatory discipline and discharge. Defendant falsely accused Plaintiff of resigning in order to effectuate the termination of her employment.

62. Defendant's conduct in subjecting Plaintiff to discipline and discharge constitutes a violation of § 31-51(q) of the Connecticut General Statutes.

63. As a result of Defendant's conduct, the Plaintiff has and continues to suffer damages including, but not limited to, mental anguish, severe emotional distress, humiliation, embarrassment and loss of enjoyment of life.

**COUNT TWO:    TORTIOUS INTERFERENCE – Individual Defendants**

1-58. Paragraphs 1-58 from above are incorporated herein as Paragraphs 1-58 of Count Two as if fully set forth herein.

59. At all times relevant hereto, Plaintiff enjoyed a business / employment relationship with Defendant.

60. Defendants Reese and Hopkins intentionally interfered with Plaintiff's

business / employment relationship with Defendant to further their own pecuniary interests / objectives, which interference caused harm to Plaintiff's relationship with Defendant.

61. As a result of Defendant's conduct, the Plaintiff has and continues to suffer damages including, but not limited to, mental anguish, severe emotional distress, humiliation, embarrassment and loss of enjoyment of life.

## COUNT THREE: INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS – All Defendants

1-58. Paragraphs 1-58 from above are incorporated herein as Paragraphs 1-58 of Count Three as if fully set forth herein.

59. Defendant's representatives' intentional conduct caused Plaintiff severe emotional distress. Defendant knew or should have known that their actions would cause Plaintiff emotional distress.

60. Defendant's representatives fabricated issues during the dinner in order to stop Plaintiff from expressing opposition to unethical and illegal practices.

61. Defendant's representatives falsely stated that Plaintiff resigned when she did not.

62. Defendant's representatives abruptly terminated Plaintiff's employment with the false position that she had resigned.

63. Defendant's representatives walked Plaintiff out of her job without notice knowing that she would have to relocate.

64. Defendant's conduct was extreme and outrageous.

65. As a result of Defendant's conduct, the Plaintiff has and continues to suffer damages including, but not limited to, mental anguish, severe emotional distress, humiliation, embarrassment and loss of enjoyment of life.

**COUNT FOUR:    NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS –**

**All Defendants**

1-58.   Paragraphs 1-58 from above are incorporated herein as Paragraphs 1-58 of Count Four as if fully set forth herein.

59.   Defendants' conduct in the termination of the Plaintiff's employment was unreasonable and created an unreasonable risk of causing Plaintiff emotional distress.

60.   Plaintiff's distress was foreseeable and severe enough that it might result in illness or bodily harm.

61.   Defendants' conduct during the termination process was the cause of Plaintiff's distress.

62.   As a result of Defendants' conduct surrounding the termination of Plaintiff's employment, the Plaintiff has and continues to suffer damages including but not limited to mental anguish, severe emotional distress, humiliation, embarrassment and loss of enjoyment of life.

## *PRAYER FOR RELIEF*

**WHEREFORE**, Plaintiff demands a trial by jury and judgment against Defendant as follows:

1. Economic damages including, but not limited to: lost wages and benefits such as pension, 401k, stock, restricted stock and stock options, deferred compensation, bonuses, health, dental, life and disability benefits with interest from the date said sums were due;

2. Non-economic compensatory damages for emotional distress, harm to reputation, and loss of enjoyment of life and equitable relief pursuant to Connecticut General Statutes §31-51q;

3. Attorneys' fees and costs of this action, including litigation costs and expert fees, pursuant to Connecticut General Statutes § 31-51q;

4. Punitive damages pursuant to Connecticut General Statutes § 31-51(q) and Connecticut common law;

5. Interest pursuant to Connecticut General Statutes § 37-3a; and

6. Such other further monetary or injunctive relief as this Court deems necessary and proper.

PLAINTIFF,

By:   /s/ Heena Kapadia 11869
      Heena Kapadia (ct11869)
      Law Office of Heena Kapadia
      572 White Plains Road
      Trumbull, CT 06611
      Phone:  203-288-8006
      *hkapadia@heenakapadialaw.com*